UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT BROOKS,

        Plaintiff,                        Hon. Ellen S. Carmody

v.                                      Case No. 4:03 CV 137

PETE YOUNGERT, et al.,

        Defendants.
_____/

## OPINION

This matter is before the Court on <u>Defendants' Motion for a New Trial or for Remittitur</u>. (Dkt. #168). For the reasons articulated below, Defendant's motion is **denied**.

## BACKGROUND

Plaintiff initiated this action on September 30, 2003, alleging that Defendants Youngert and Stowell assaulted him without provocation in violation of the Eighth Amendment to the United States Constitution. Plaintiff also claimed that Defendants' actions constituted assault and battery under Michigan law. Following a three day trial, a jury concluded that both Defendants assaulted Plaintiff in violation of the Eighth Amendment as well as Michigan law.

The jury awarded Plaintiff four dollars in actual damages - one dollar from each Defendant for the Eighth Amendment violation and one dollar from each Defendant for the assault and battery violation. The jury also awarded Plaintiff six-thousand dollars in punitive damages, three-thousand dollars from each Defendant. Asserting that the jury's damages award violates their

constitutional right to due process, Defendants move the court to reduce the amount of punitive damages to twenty dollars (ten dollars as to each Defendant) or, in the alternative, grant Defendants a new trial on the issue of damages.

## **STANDARD**

A jury verdict is not subject to remittitur "unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *Gregory v. Shelby County*, 220 F.3d 433, 443 (6th Cir. 2000) (citations omitted); *see also, Benson v. City of Wellston*, 2006 WL 3154855 at *3 (6th Cir., Nov. 6, 2006) (same). Moreover, the Court cannot remit the jury's damage award unless it is (1) beyond the range supportable by proof; (2) so excessive as to shock the conscience; or (3) the result of a mistake. *See Gregory*, 220 F.3d at 443; *City of Wellston*, 2006 WL 3154855 at *3. When evaluating Defendants' motion, the Court must review the evidence in this matter in a light most favorable to Plaintiff. *See Gregory*, 220 F.3d at 443.

## **ANALYSIS**

Defendants assert that the punitive damages award in this matter is excessive and, therefore, runs afoul of the Due Process Clause of the Fourteenth Amendment. To support their argument Defendants rely on *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) and *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003). As discussed below, however, the Court concludes that the jury's punitive damages award in this matter is consistent with this authority.

Before analyzing the merits of Defendants' motion, a detailed examination of the authority on which Defendants rely is appropriate.

I.         *BMW of North America, Inc. v. Gore*

This case involved a state law fraud claim asserted by Gore regarding his purchase of an automobile. Shortly after purchasing a new BMW automobile (for approximately $40,000), Gore discovered that the vehicle had been repainted prior to its sale. *Gore*, 517 U.S. at 563. Gore had not been informed of this fact. Under then applicable Alabama law, "[s]uppression of a material fact which a party is under an obligation to communicate" constituted fraud. Gore subsequently initiated a fraud claim in Alabama state court in which he alleged that the fact that his vehicle had been repainted prior to its sale constituted a material fact and, furthermore, that the failure to inform him of that material fact constituted fraud under Alabama law. Gore sought actual damages in the amount of $4,000 as well as $4 million in punitive damages. *Id.*

With respect to his claim for actual damages, Gore presented testimony that the value of a repainted BMW vehicle was approximately ten percent less than the value of a new BMW vehicle which had not been damaged and repainted. *Id.* at 564. In support of his request for punitive damages, Gore presented evidence that BMW had adopted a nationwide non-disclosure policy pursuant to which BMW would not disclose pre-sale damage to a vehicle unless the cost to repair such damage exceeded three percent of the vehicle's suggested retail price. *Id.* at 563-64. Gore presented evidence that over the previous several years BMW had sold as "new" 983 other vehicles which had been similarly damaged and repainted prior to sale pursuant to its non-disclosure policy. *Id.* at 564. Of the 983 transactions cited by Gore in support of his claim for punitive damages only 14 occurred in the state of Alabama. *Id.*

Using his own actual damages estimate of $4,000 as a baseline measure, Gore asserted that "a punitive award of $4 million would provide an appropriate penalty for selling approximately

1,000 cars for more than they were worth." The jury awarded Gore $4,000 in actual damages. *Id.* at 565. The jury also awarded Gore $4 million in punitive damages, on the ground that BMW's actions constituted "gross, oppressive or malicious" fraud under Alabama law.

On appeal, BMW challenged the jury's punitive damages award, noting that its non-disclosure policy (on which the jury's punitive damage award appeared to be based) was lawful in many of the states in which the challenged transactions occurred. BMW further noted that its non-disclosure policy had never - in any state - been adjudged unlawful prior to the initiation of Gore's action. *Id.* The Alabama Supreme Court concluded that the jury impermissibly based its punitive damages award on transactions occurring outside the state of Alabama and, therefore, reduced the punitive damages award to $2 million. *Id.* at 566-67. The United States Supreme Court subsequently granted certiorari in the case to "illuminate the character of the standard that will identify unconstitutionally excessive awards" of punitive damages. *Id.* at 567.

In analyzing the jury's verdict, the Court "accept[ed] the Alabama Supreme Court's interpretation of the jury verdict as reflecting a computation of the amount of punitive damages 'based in large part on conduct that happened in other jurisdictions.'" *Id.* at 573. With respect to this circumstance, the Court observed that principles of comity and state sovereignty prevent an individual state from "impos[ing] economic sanctions [via punitive damages] on violators of its laws with the intent of changing the tortfeasor's lawful conduct in other states." *Id.* at 572. Accordingly, the Court concluded that the state of Alabama was without authority to either (a) punish BMW for conduct that was lawful where it occurred and that had no impact on Alabama or its residents; or (b) impose sanctions on BMW in order to deter conduct that is lawful in other jurisdictions. *Id.* at 572-73.

The Court concluded, therefore, that the Alabama Supreme Court "properly eschewed reliance on BMW's out-of-state conduct and based its remitted award solely on conduct that occurred within Alabama." *Id.* at 573-74. While recognizing that the Alabama Supreme Court gave consideration "only to the interests of Alabama consumers, rather than those of the entire Nation," the Court nonetheless found the Alabama Supreme Court's remitted punitive damages award to be "grossly excessive." *Id.* at 574. Specifically, The *Gore* Court observed that

> Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose. Three guideposts, each of which indicates that BMW did not receive adequate notice of the magnitude of the sanction that Alabama might impose for adhering to the nondisclosure policy adopted in 1983, lead us to the conclusion that the $2 million award against BMW is grossly excessive: the degree of reprehensibility of the nondisclosure; the disparity between the harm or potential harm suffered by Dr. Gore and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases.

*Id.* at 574-75.[1]

The Court then analyzed the facts of the case in light of these particular factors. The Court first observed that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* at 575. As the Court observed, this principle "reflects the accepted view that some wrongs are more blameworthy than others." *Id.* For example, "nonviolent crimes are less serious than crimes marked by violence or the threat of violence." *Id.* at 576.

---

[1] Later in its opinion the Court recognized that this comparison can also include an examination of the "*criminal* penalties that could be imposed for comparable misconduct." *Id.* at 583 (italics added).

Noting that the harm Gore suffered was "purely economic in nature," the Court concluded that "none of the aggravating factors associated with particularly reprehensible conduct is present." *Id.* The Court concluded, therefore, that while BMW's conduct was sufficient to give rise to tort liability and "even a modest award of exemplary damages," its conduct does not evidence "the high degree of culpability that warrants a substantial punitive damages award." *Id.* at 580.

With respect to the second factor, the Court observed that the "perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Id.* In this respect, the Court suggested that a ratio of greater than 10:1 between a punitive damages award and the amount awarded in actual damages was constitutionally suspect. *Id.* at 581. The Court recognized, however, that "we have consistently rejected the notion that the constitutional line [between appropriate and inappropriate punitive damages awards] is marked by a simple mathematical formula." *Id.* at 582. Moreover, as the Court further stated:

> Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Id.*

The Court concluded that the ratio of 500:1 between Gore's actual damages and the amount of punitive damages permitted by the Alabama Supreme Court "must surely raise a suspicious judicial eyebrow." *Id.* at 583.

Finally, the Court observed that when comparing the civil or criminal penalties that could be imposed for comparable misconduct, "substantial deference" must be accorded to a state legislature's judgments concerning "appropriate sanctions for the conduct at issue." *Id.* With respect to this final

factor, the Court observed that at the time BMW's actions were challenged there was no judicial decision by an Alabama court suggesting that BMW's non-disclosure policy could possibly give rise to such "severe punishment." *Id.* at 584. The Court further observed that the maximum civil penalty permitted under Alabama law for violation of its Deceptive Trade Practices Act was a fine of $2,000. *Id.*

In light of these various factors, the Court concluded that BMW's conduct was not sufficiently egregious to justify a "punitive sanction that is tantamount to a severe criminal penalty." *Id.* at 585. The matter was, therefore, remanded to the Alabama state courts. *Id.* at 586.

II.        ***State Farm Mutual Automobile Ins. Co. v. Campbell***

In 1981, Curtis Campbell, while driving in Utah, was involved in an automobile accident in which Todd Ospital was killed and Robert Slusher was rendered permanently disabled. *State Farm*, 538 U.S. at 412-13. Ospital's estate (Ospital) brought a wrongful death action against Campbell, who also had to defend a tort action brought by Slusher. *Id.* at 413. While Campbell denied he was at fault for the automobile accident, an investigation revealed otherwise. Despite the results of this investigation as well as the advice of its own investigator, State Farm, Campbell's insurance company, decided to contest liability in the matter. Accordingly, State Farm declined offers by Slusher and Ospital to settle their claims for an amount equal to Campbell's policy limit of $50,000 ($25,000 for each claimant). In making the decision to contest liability, State Farm assured Campbell and his family that "their assets were safe, that they had no liability for the accident, that [State Farm] would represent their interests, and that they did not need to procure separate counsel."

Following a trial, a jury determined that Campbell was 100 percent at fault for the accident and awarded $185,849 in damages. State Farm refused to cover the $135,849 in damages

beyond Campbell's policy limit and, furthermore, instructed Campbell that he "may want to put for sale signs on [his] property to get things moving." Campbell subsequently obtained different counsel to represent him on appeal. While the matter was pending on appeal, Slusher, Ospital, and Campbell reached an agreement whereby Slusher and Ospital agreed not to seek satisfaction of their claims against Campbell. *Id.* In return, Campbell agreed to pursue a bad faith claim against State Farm and further agreed that Slusher and Ospital would receive 90 percent of any amounts recovered against State Farm. *Id.* at 413-14.

In the initial phase of Campbell's bad faith action, the jury found that State Farm's decision not to settle the claims by Slusher and Ospital was unreasonable because there existed a substantial likelihood of a verdict in excess of Campbell's policy limits. *Id.* at 414. During the trial's damages phase, State Farm asserted that its decision to contest liability at trial was an "honest mistake" that did not justify the imposition of punitive damages. *Id.* at 414-15. In response, Campbell introduced evidence that State Farm's decision to take the case to trial was the product of "a national scheme to meet corporate fiscal goals by capping payouts on claims company wide." *Id.* at 415.

To establish the existence of this scheme, Campbell was permitted to introduce "extensive expert testimony regarding fraudulent practices by State Farm in its nation-wide operations." Most of this evidence bore no relation to third-party automobile insurance claims, the type of claim underlying Campbell's action against State Farm. State Farm objected to the admission of this evidence, but the trial court overruled the objection on the ground that such evidence was "admissible to determine whether State Farm's conduct in the Campbell case was indeed intentional and sufficiently egregious to warrant punitive damages."

The jury awarded Campbell $2.6 million in compensatory damages and $145 million in punitive damages, which the trial court reduced to $1 million and $25 million respectively. On appeal, the Utah Supreme Court reinstated the $145 million punitive damages award. Its decision in this regard was based "in large part" on the evidence presented concerning State Farm's alleged nationwide fraudulent scheme. *Id.* The Supreme Court agreed to review the matter so that it could "address once again the measure of punishment, by punitive damages, a State may impose upon a defendant in a civil case" consistent with the Due Process Clause of the Fourteenth Amendment. *Id.* at 412.

In assessing the determination of the Utah Supreme Court, the *State Farm* Court reiterated that

> The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. The reason is that elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.

*Id.* at 416-17 (internal citations omitted).

The Court observed that punitive damages "pose an acute danger of arbitrary deprivation of property" because jury instructions "typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences." *Id.* at 417. This concern is "heightened when the decisionmaker is presented. . .with evidence that has little bearing as to the amount of punitive damages that should be awarded." *Id.* at 418. As the Court noted, it was because of these concerns that the *Gore* Court articulated the three factors identified above to assess whether a punitive damages award runs afoul of the Fourteenth Amendment.

With respect to the degree of reprehensibility of the defendant's conduct, the Court observed that "punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.* at 419. While the Court found that State Farm's conduct "merits no praise," a "more modest punishment for [its] reprehensible conduct could have satisfied the State's legitimate objectives, and the Utah courts should have gone no further." *Id.* at 419-20. However, as the Court observed, the Utah courts used Campbell's case "as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country" and the decision by the Utah Supreme Court "makes explicit that State Farm was being condemned for its nationwide policies rather than for the conduct directed toward the Campbells." *Id.* at 420.

Campbell conceded that "much" of the out-of-state conduct on which the punitive damages award was based was "lawful where it occurred." *Id.* at 422. The Court reiterated that principles of comity, state sovereignty, and federalism prevent a State from punishing a defendant "for conduct that may have been lawful where it occurred." *Id.* at 421. The Court further observed that a State does not possess "a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction." *Id.* The Court found that the Utah court's reliance on evidence regarding State Farm's out-of-state conduct violated these fundamental principles. *Id.* at 422. However, the Court further concluded that for "a more fundamental reason" the Utah courts improperly relied on such out-of-state conduct:

> The [Utah] courts awarded punitive damages to punish and deter conduct that bore no relation to the Campbells' harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in

>   the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis, but we have no doubt the Utah Supreme Court did that here.

*Id.* at 422-23.

With respect to the second factor, the Court reiterated that there did not exist a "bright-line ratio which a punitive damages award cannot exceed." *Id.* at 424-25. The Court noted that while "few awards exceeding a single-digit ratio between punitive and compensatory damages. . .will satisfy due process," ratios greater than this "may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *Id.* at 425. In this regard, the Court again recognized a distinction between harms which arise "from a transaction in the economic realm" as contrasted with harm which derives from "physical assault or trauma." *Id.* at 426. Finally, the Court concluded that

>   The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff. In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.

*Id.* at 425-26.

With respect to the third factor, the Court observed that "the most relevant civil sanction under Utah state law for the wrong done to the Campbells appears to be a $10,000 fine for an act of fraud, an amount dwarfed by the $145 million punitive damages award." *Id.* at 428.

In light of the relevant factors, the Court concluded that the punitive damages award of $145 million was "neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant." *Id.* at 429. Accordingly, the matter was remanded to the state court. *Id.*

**III.**     *Brooks v. Youngert*

The Court has described the *Gore* and *State Farm* decisions in such detail so as to make clear the distinctions between those cases and the circumstances presently before the Court. In the Court's estimation, the distinctions between the cases are significant and dispositive.

    A.    Degree of Reprehensibility

As indicated above, perhaps "the most important" factor in determining whether an award of punitive damages is unreasonable or excessive is "the degree of reprehensibility of the defendant's conduct." As discussed above, the Gore and State Farm cases both involved instances of purely economic harm. On the other hand, the present Defendants subjected Plaintiff to unjustified violence contrary to the Eighth Amendment to the United States Constitution. As the *Gore* and *State Farm* Courts recognized, violent crimes are more blameworthy (i.e., reprehensible) than the purely economic wrongs perpetrated in those cases.

Furthermore, it is important to understand the precise context in which Defendants' violent actions occurred. Defendants' assault of Plaintiff was not the result of an instantaneous heat-of-the-moment response to inappropriate or dangerous behavior by Plaintiff (or anybody else). To the contrary, Defendants subjected Plaintiff to a premeditated and unprovoked assault, committed in the middle of the night under the cover of darkness. While the use of excessive force is never justified, the Court finds that (all other things being equal) the use of excessive force is much more blameworthy in the latter circumstance. Thus, this factor weighs heavily in favor of affirming the punitive damages awarded by the jury in this matter.

B.  Ratio between Punitive Damages and Actual Damages

The Court recognizes that the 1500:1 ratio in this matter between punitive damages and actual damages may be "suspect." However, as the Supreme Court has made clear, the line between appropriate and inappropriate punitive damage awards cannot be determined by reference to a mathematical formula. Furthermore, as the *Gore* and *State Farm* Courts recognized, a high ratio may be consistent with due process where "a particularly egregious act has resulted in only a small amount of economic damages."

The jury found that Plaintiff suffered only minimal actual damages. It is not clear whether this conclusion was the result of conflicting evidence regarding the extent of Plaintiffs' injuries or other considerations.[2] Nonetheless, the fact that Defendants' actions resulted in less physical harm than might otherwise have been the case while relevant does not justify diminishing the jury's punitive damages award where Defendants' acted in a "particularly egregious" manner. In this respect, the Court finds that the premeditated deprivation - through violent means - of a fundamental constitutional right cannot reasonably be characterized in any other way.

As the *State Farm* Court stated with respect to this particular factor, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." The Court finds that the modest amount of punitive damages awarded in this matter satisfy this standard. Accordingly, this factor also weighs in favor of upholding the jury's punitive damages award.

---

[2] While the jury is to be commended for taking seriously its task to weigh the evidence in this matter, the Court finds that the jury's actual damages award simply flies in the face of the evidence presented at trial. Were it within the Court's power, it would increase the amount of actual damages awarded to Plaintiff to achieve a ratio satisfactory to Defendants. However, the right to trial by jury, guaranteed by the Seventh Amendment, prevents a federal court from granting additur. *See, e.g., Tezak v. Montgomery Ward & Co., Inc.*, 33 Fed. Appx. 172, 177-78 (6th Cir., Mar. 28, 2002) (citing *Dimick v. Schiedt*, 293 U.S. 474 (1935)).

### C.      Civil and Criminal Penalties Authorized in Similar Cases

The State of Michigan provides for criminal penalties of up to 10 years in prison and fines up to $5,000 for convictions of assault with the intent to do great bodily harm less than murder. *See* Mich. Comp. Laws § 750.84. Lesser degrees of assault provide for lesser penalties, ranging from 93 to 365 days in prison and fines ranging from $500 to $1,000. *See* Mich. Comp. Laws §§ 750.81(1), 750.81a(1). The civil penalties imposed for similar deprivations of the Eighth Amendment right to be free from cruel and unusual punishment have (in the Western District of Michigan) ranged from several thousand dollars to awards exceeding one-hundred thousand dollars. *See*, *e.g., Johnson v. Howard*, 24 Fed. Appx. 480 (6th Cir., Dec. 12, 2001) (punitive damage award of $300,000 affirmed where defendant violated inmate's Eighth Amendment right to be free from cruel and usual punishment).

As Plaintiff further notes, the Sixth Circuit has affirmed significant punitive damages awards in cases involving *non-violent* deprivations of inmates' constitutional rights. *See, e.g., Reilly v. Grayson*, 310 F.3d 519 (6th Cir. 2002) (court affirmed punitive damages award of $18,250 where defendants denied inmate's request to be housed in a smoke-free environment); *Siggers-El v. Barlow*, 433 F.Supp.2d 811 (E.D. Mich. 2006) (court affirmed punitive damages award of $200,000 where defendant improperly transferred inmate in retaliation for exercising his First Amendment rights).

In sum, the jury's punitive damages award in this matter is not inconsistent with the criminal or civil penalties imposed or authorized in similar cases.

### D.      Other Considerations

As discussed immediately above, the three factors articulated by the *Gore* and *State Farm* Courts all weigh in favor of affirming the jury's punitive damages award. The Court also finds it

significant that the primary concerns which prompted the *Gore* and *State Farm* Courts to articulate the three-part test discussed above are simply not implicated in this matter.

The *Gore* and *State Farm* Courts both discussed the comity, federalism, and state sovereignty concerns raised by the actions of the juries in those two cases. As the Court recognized, the courts of an individual state lack the constitutional authority to punish a defendant (through the imposition of punitive damages) for conduct which either (a) did not harm a resident of that particular state, or (b) was committed in another jurisdiction in which such conduct was not unlawful. These particular comity, federalism, and state sovereignty concerns are simply not present in this case.

More importantly, as the *Gore* and *State Farm* Courts indicated, the ultimate question presented by Defendants' motion is one of fair notice. As the *Gore* Court stated, "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." The fundamental infirmity in the *Gore* and *State Farm* cases was that the defendants in those cases were not given fair notice that their alleged conduct could subject them to such wildly enormous damage awards. Such is simply not the case here.

Every prison guard surely recognizes that if found to have engaged in conduct which deprives an inmate of the right to be free from cruel and unusual punishment, a damages award ranging from several thousand to several hundred thousand (or more) is likely to be entered. Thus, Defendants Brooks and Youngert had sufficient notice that their conduct in this matter could result in a damages award of $3,002.

**CONCLUSION**

Every factor and consideration identified by the *Gore* and *State Farm* Courts weighs against Defendants' motion for remittitur and in favor of affirming the jury's punitive damages award. Because, there exists no basis for disturbing the jury's punitive damages award, Defendants' motion for a new trial on the issue of damages must likewise fail. Accordingly, for the reasons articulated herein, <u>Defendants' Motion for a New Trial or for Remittitur</u>, (dkt. #168), is **denied**. An Order consistent with this Opinion will enter.


Date:  December 19, 2006                     /s/ Ellen S. Carmody
                                             ELLEN S. CARMODY
                                             United States Magistrate Judge